UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


AMERICAN NATIONAL PROPERTY                                    PLAINTIFF/
AND CASUALTY COMPANY                               COUNTER-DEFENDANT

VS.                              CIVIL ACTION NO. 3:18CV0177-TSL-RPM

ESTATE OF JASON FARESE; ESTATE OF
LEA FARESE; JOHN S. FARESE, AS GUARDIAN
OF L.V.F., L.W.F., AND A.P.F., THE
NATURAL CHILDREN AND WRONGFUL DEATH
BENEFICIARIES OF LEA AND JASON FARESE;
ESTATE OF AUSTIN POOLE; ESTATE OF
ANGELA ROARK POOLE; LESLIE HERRING
MILEY, AS GUARDIAN OF W.J.P. AND K.W.P.,
THE MINOR NATURAL CHILDREN AND WRONGFUL
DEATH BENEFICIARIES OF AUSTIN POOLE;
JAMES K. WARRINGTON, AS GUARDIAN OF
K.E.W., W.A.W, AND J.P.W., THE MINOR
NATURAL CHILDREN AND WRONGFUL DEATH
BENEFICIARES OF ANGELA ROARK POOLE;
ESTATE OF MICHAEL MCCONNELL PERRY;
ESTATE OF KIMBERLY WESTERFIELD PERRY;
ROBERT PERRY, AS GUARDIAN OF S.M.P.,
J.W.P., AND A.R.P., THE MINOR NATURAL
CHILDREN AND WRONGFUL DEATH BENEFICIARIES
OF MICHAEL MCCONNELL PERRY AND KIMBERLY
WESTERFIELD PERRY; OXFORD UNIVERSITY
AIRCRAFT CHARTERS, LLC; OXFORD AIRCRAFT
CHARTERS, LLC; AND NORTH MISSISSIPPI              DEFENDANTS/
EQUIPMENT, INC.                            COUNTER-PLAINTIFFS


MEMORANDUM OPINION AND ORDER

     This action involves an insurance dispute relating to an

August 2016 airplane crash in which the pilot and all five

passengers were killed.  American National Property and Casualty

Company (ANPAC), which insured the plane, a 1984 Piper PA 325 CR

Navajo airplane (FAA Registration No. N4447S), has brought this

1

action pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 for a declaratory judgment that the bodily injury and property damage coverage under its Policy No. AC-01252-00, does not apply to losses resulting from the crash. The defendant insureds and claimants under the policy have generally denied that the accident is not covered and have also asserted various counterclaims against ANPAC, claiming, among other things, that by its post-crash conduct, ANPAC waived its right to deny coverage and/or is estopped from doing so.[1]

ANPAC has moved for summary judgment regarding coverage (Dkt. No. 159) and regarding the various counterclaims (Dkt. No. 161). The defendant claimants have responded in opposition to ANPAC's motion but have also moved pursuant to Rule 54(d) for deferral of ruling on the motions pending further discovery (Dkt. No. 177), and they have filed their own motion for summary judgment on their waiver defense (Dkt. No. 167). ANPAC has responded in opposition to these motions. For reasons which follow, the court concludes that the motion for deferral of ruling on ANPAC's summary judgment motions should be denied; ANPAC's motion for summary judgment regarding coverage should be granted; ANPAC's motion for summary judgment regarding

---

[1] Two of the defendants, Oxford University Aircraft Charters, LLC (now dissolved) and Oxford Aircraft Charters, LLC (now dissolved), have not answered the complaint.

counterclaims should be granted in part and denied in part; and the claimant defendants' motion for summary judgment as to waiver should be denied.

## I.   FACTS AND PROCEDURAL HISTORY

On August 14, 2016, an airplane piloted by Dr. Jason Farese departed Orlando, Florida, with an intended destination of Oxford, Mississippi.  Five passengers were onboard:  Lea Farese, Dr. Farese's wife, and two other couples, Austin and Angela Poole and Michael and Kimberly Perry.  Approximately an hour and fifteen minutes after taking off from Kissimmee Gateway Airport, Dr. Farese reported a failure of a fuel pump and requested diversion to the nearest airport; at that time, Tuscaloosa Regional Airport was approximately twenty miles away.  When the plane was about thirteen miles from the Tuscaloosa airport, Dr. Farese reported the plane had lost "the other fuel pump" and had "no power."  Approximately 1,650 feet from the approach end of the runway, the plane crashed, killing everyone onboard.

The cause of the crash, as eventually determined by the National Transportation Safety Board (NTSB), was not a failure of the fuel pumps.  Rather, the immediate cause was fuel starvation:  Although the plane had enough fuel to complete the flight from Orlando to Oxford, Dr. Farese failed to switch from the outboard fuel tanks to the inboard tanks once the fuel in the outboard tanks was exhausted.

Dr. Farese had purchased the accident airplane five months earlier, on March 15, on behalf of Oxford University Aircraft Charters, LLC (OUAC), and had secured insurance coverage on the plane from ANPAC, through Acceleration Aviation Underwriters, Inc. (AAU), which handled all of ANPAC's aviation insurance business, including underwriting and claims management. The ANPAC policy provided hull coverage of $650,000, and single limit bodily injury and property damage coverage of $1 million.

On August 15, the day after the crash, ANPAC and AAU received notice of the crash when Dr. Farese's father, John Farese, requested payment under the policy's $650,000 hull coverage for loss of the plane. AAU, on behalf of ANPAC, retained an independent adjusting firm to handle the claim, which assigned the claim to adjuster Hope DeLong. Following her investigation, Ms. DeLong reported to AAU on October 4, 2016 that she had "everything [she] needed for the hull payment" and there was "nothing to preclude loss payment." Accordingly, on October 6, 2016, ANPAC paid the available hull coverage of $650,000, less a $1,000 deductible.[2]

---

[2] While ANPAC seeks a declaration of no coverage, it has not sought to recoup the hull payment, which it says was paid gratuitously.

Just over a year later, on October 13, 2017, the Perry defendants[3] filed a wrongful death lawsuit in Lafayette County Circuit Court, Cause No. L17-439, against the Estate of Jason Farese, OUAC and its members – all ANPAC insureds.[4] ANPAC undertook to defend the Estate of Jason Farese (Farese Estate) without reservation of rights by retaining attorney David O'Donnell to file an answer on behalf of OUAC and Dr. Farese's estate, which he did on January 12, 2018.[5] Two months later, in March 2018, O'Donnell, as attorney for ANPAC, filed an interpleader action in Lafayette County Chancery Court, Cause No. CV2018-137, representing ANPAC was a "disinterested stakeholder" that was "ready, willing and able" to pay its $1 million liability limit into the court's registry, so that the

---

[3] The Perry defendants are the Estates of Michael McConnell Perry and Kimberly Westerfield Perry, represented by Kurt Rademacher, as executor, and the Perrys' three children, represented by Robert Andrew Perry, as next friend and guardian.

[4] OUAC had two members, North Mississippi Equipment, Inc. (NME) and Oxford Aircraft Charters LLC, (OAC); OUC had two members, Jason Farese and Terry Warren. In addition to the Perry defendants' allegations of negligence by Dr. Farese and vicarious liability of OUAC, they alleged that NME and/or OAC should be held personally liable to the extent they may have received distributions of assets in the wind-up of OUAC in violation of their obligation under Miss. Code Ann. § 79-29-813(1) to first satisfy liabilities of OUAC, including those resulting from the plane crash.

[5] ANPAC ultimately denied NME's request for a defense, taking the position that the Perry claimants' allegations against NME were not covered under the policy. NME has asserted a counterclaim for breach of the duty to defend. See infra pp. 49-50.

court could determine the rights of the various claimants to the policy proceeds.

On April 27, 2018, the NTSB, having completed its investigation of the crash, released its Factual Report, which recited, among other things, the following:

> The pilot's logbook noted that he received a total of 2.9 hours of dual flight instruction during two flights on March 17, 2016. The flight instructor who flew with the pilot on March 17 and accompanied him on several other flights stated that he did not provide the pilot with any multi-engine training and he believed that the pilot had not received any training in the accident airplane. The pilot "took the airplane pilot operating handbook home and read it." In addition, the flight instructor did not practice any single-engine operations or emergency procedures with the pilot in the accident airplane. He stated that they couldn't practice those procedures with "people in the airplane and we always flew" with passengers. When asked about the pilot's checklist usage, he stated that the pilot would use the checklists and "go through the cockpit like [he] should."

The NTSB's Final Report, issued May 9, 2018, found the probable cause of the crash to be "[a] total loss of power in both engines due to fuel starvation as a result of the pilot's fuel mismanagement, and his subsequent failure to follow the emergency checklist." The NTSB determined that the pilot's "lack of emergency procedures training in the accident airplane" was a contributing cause of the accident.

After receiving the NTSB Factual Report, ANPAC immediately began reassessing its position on coverage. Under the terms of

ANPAC's policy, Dr. Farese was required to "receive at least 10 hours of flight instruction to include an instrument proficiency check in the insured aircraft from an FAA certified flight instructor…" before acting as sole pilot in command, yet according to the NTSB report, Dr. Farese had received only 2.9 hours of instruction.  On May 1, 2018, Chris Jones, President of AAU, e-mailed David O'Donnell, stating:

> I just finished reading the NTSB factual report and I see a potential problem that was previously unknown to us.
> … If the NTSB report is accurate, Jason Farese did not complete the training requirement and therefore did not meet the pilot requirement under the policy.  I am contacting our adjuster to see if they had any information in the file about Jason's pilot experience as we have nothing in our file.
> I will let you know what I find out and we can discuss if we need to rethink our approach.

On May 10, after receiving the NTSB Final Report, Jones wrote to O'Donnell, again noting that "[p]er the NTSB report, Mr. Farese did not complete that training and therefore did not meet the pilot requirements of the policy."  Jones expressed that "[d]ue to the lapse of time and since we have paid the hull claim, I don't know if this makes a difference in our strategy relative to the liability claim, but it is worth noting."  O'Donnell responded:  "Assuming the coverage is there (interpleader), I think now is the time to pursue a mediation in an effort to achieve a global settlement."  Jones replied that this "sound[ed] like a reasonable approach."  O'Donnell told Jones,

"Let me know if, and when, a final decision on coverage has been made, that is, whether the insurer intends to pursue a failure of policy conditions or not."  Jones responded:

> It is unlikely that we will be able to assert a policy defense at this point in time.  Had the pilot's lack of training been discovered sooner we may have been in a different position.  I will be discussing this with others today but I don't foresee any changes in our position.

O'Donnell wrote that he "believe[d] that is the correct position, for what it's worth," and advised that "[i]n the meantime, I've sent an email to counsel [for the claimants] inquiring about an early mediation."

On May 21, O'Donnell wrote to inform Jones that a mediation had been scheduled for July 3, and stating, "It is my intent to resolve all claims, including the interpleader … during the mediation."  He wrote to Jones again on June 18, stating:  "We are still set for the mediation on July 3, in Oxford. … I assume the policy limits have been placed on the table by virtue of the interpleader."  Jones responded:  "We are still investigating based upon the information made available by the NTSB recently. From your chair nothing has changed.  As soon as we know anything further I will advise."

On July 2, O'Donnell informed Jones via e-mail that the mediation had been cancelled because at the last minute, the Perry defendants wanted additional financial information

relating to the assets in Jason Farese's estate before they would engage in settlement discussions. O'Donnell further advised:

> [T]he Poole Estates are willing to settle for half of the insurance proceeds. The Rademacher (Perry) plaintiffs are agreeable and it will be subject to chancery court approval as it involves the settlement of minor claims. However, as an initial matter, we should tender the policy limits into the registry of the court in the interpleader action. Let me know what information you need for disbursement.

On July 6, 2018, ANPAC sent reservation of rights letters to its insureds stating that it had not yet completed its investigation of the accident and would, from that point forward, proceed under a reservation of rights. Jones e-mailed O'Donnell informing him that these letters had been sent, and stating, "We are continuing to investigate new information revealed by the NTAB's (sic) final report."

Presumably pursuant to its continuing investigation, ANPAC discovered in July 2018 that Charles Phillips, the individual the NTSB identified as Dr. Farese's flight instructor, had been indicted in December 2017 for, among other things, giving flight instruction to Dr. Farese without a valid flight instructor certificate.[6] On July 25, 2018, ANPAC, through new counsel,

---

[6] Prior to 2010, Phillips had been FAA certified for single-engine flight instruction, but the FAA had suspended his medical certificate, which is required for flight instruction, and after his flight instructor's certificate expired on August 31, 2010,

moved to voluntarily dismiss its interpleader action, stating
that it "intended to investigate whether there was insurance
coverage for the underlying incident."  A month later, on August
21, 2018, ANPAC filed the present declaratory judgment action
against the insureds and claimants seeking a determination that
its policy does not provide liability coverage for the subject
accident, as Jason Farese did not meet the policy's requirements
for piloting the plane as sole pilot in command.[7]

The Estate of Lea Farese has answered and denied ANPAC's
allegation of no coverage.[8]  The remaining defendants have

---

it was never renewed.  In December 2017, he was indicted on
charges that he operated an aircraft and provided flight
instruction without a valid airman's certificate, and in
particular, that he acted as Dr. Farese's flight instructor on
multiple occasions from March 17, 2016 to May 19, 2016, and that
he falsely provided instrument proficiency checks and flight
review endorsements to Jason Farese in a multi-engine airplane
(on May 14, 2016), knowing he did not hold a multi-engine
airplane instructor rating.

[7] Shortly after this declaratory judgment action was
reassigned to the undersigned on June 18, 2019, an order was
entered staying this case pending a ruling by the chancery court
on ANPAC's motion for voluntary dismissal.  Following extensive
briefing by the parties and an October 11, 2018 hearing, the
chancery court issued its findings of fact and conclusions of
law on September 21, 2020, granting ANPAC's motion.  The stay in
this action was lifted by order entered September 23.

[8] A review of the docket reflects that John Farese,
representative of Jason and Lea Farese's three minor children,
has not filed an answer.

The court notes that sometime in 2018, a wrongful death
action was filed on behalf of the Estate of Lea Farese and her
wrongful death beneficiaries against the Estate of Jason Farese
in the Circuit Court of Lafayette County, Cause No. L18-516.  In
December 2020, following a trial, a verdict was returned for the

answered and asserted counterclaims. The J. Farese Estate has counterclaimed for breach of contract/bad faith breach of contract, charging that ANPAC failed to conduct a reasonable coverage investigation, issued untimely reservation of rights letters which prejudiced its efforts to settle the claims against it, and failed and refused to dismiss this action despite the absence of any legitimate or arguable reason for its denial of coverage.

NME has asserted a counterclaim for bad faith based on ANPAC's denial of its request for a defense in the Perry lawsuit. The Perry defendants have filed a counterclaim for a declaratory judgment that they are entitled to indemnity under the policy based on ANPAC's having admitted coverage by paying the hull claim and filing the interpleader action as a disinterested stakeholder.

The Poole defendants[9] have asserted counterclaims against ANPAC for or based on equitable estoppel, promissory estoppel, quasi estoppel, bad faith, and breach of an alleged settlement agreement.

---

plaintiffs in the sum of $4,349,251.75. ANPAC states that the Estate of Jason Farese did not request a defense of that action.

[9] The Poole defendants are the Estates of Austin Poole and Angela Poole, and their five children. Austin Poole had two children from his previous marriage to Leslie Miley, and Angela Poole had three children from her previous marriage to James K. Warrington. Miley and Warrington represent the interests of their respective children.

11

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." Reeves v.

12

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct.
2097, 147 L. Ed. 2d 105 (2000).  Conclusory allegations,
speculation, unsubstantiated assertions and legal arguments are
not an adequate substitute for specific facts showing a genuine
issue for trial.  TIG Ins. Co. v. Sedgwick James of Wash., 276
F.3d 754, 759 (5th Cir. 2002).

### III. PRELIMINARY ISSUES

#### A. Standing

ANPAC acknowledges that the Poole and Perry defendants have
standing to bring an action for declaratory judgment as to
coverage, as Rule 57(b)(2) of the Mississippi Rules of Civil
Procedure expressly provides that "[w]here an insurer has denied
or indicated that it may deny that a contract covers a party's
claim against an insured, that party may seek a declaratory
judgment construing the contract to cover the claim."  It
contends, however, that they have no standing to assert claims
of bad faith or estoppel.

The Fifth Circuit has held that "injured parties named as
defendants in a declaratory judgment action brought by an
insurance company ha[ve] standing … to challenge [the insurer's]
claim that it owes no coverage to its insureds and has no duty
to defend."  Looney Ricks Kiss Architects, Inc. v. State Farm
Fire & Cas. Co., 677 F.3d 250, 257 (5th Cir. 2012).  This
includes standing to seek a declaratory judgment that there is

13

coverage or a duty to defend based on waiver or estoppel.  See Maryland Cas. Co. v. Nestle, No. 1:09 CV 644-LG-RHW, 2010 WL 3735756, at *4 (S.D. Miss. Sept. 17, 2010) (explaining that claimants under policy have standing to raise the issue of coverage by estoppel).  The Pooles also have standing to assert their claim for and related to breach of an alleged settlement agreement to which they are a party.[10]

### B. Rule 54(d) Motion

The Poole and Perry defendants have jointly moved pursuant to Federal Rule of Civil Procedure 56(d) to deny or defer ruling on ANPAC's summary judgment motions until discovery has been completed.  ANPAC opposes the motion.

Under Rule 56(b), "a party may file a motion for summary judgment at any time," Fed. R. Civ. P. 56(b), including before discovery is taken or completed, but to ensure that summary judgment is not granted prematurely, Rule 56(d) allows a court to defer ruling on a motion for summary judgment where the non-moving party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d).  To obtain additional discovery under Rule 56(d), the movant "may not simply rely on vague assertions that additional discovery will produce needed,

---

[10] See infra pp. 44-46 for discussion of standing as to the Poole defendants' bad faith counterclaim.

but unspecified, facts", but must instead "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." Sherman v. Irwin, No. 20-30012, 2021 WL 855821, at *3 (5th Cir. Mar. 5, 2021) (internal quotation marks and citations omitted). See also Smith v. Reg'l Transit Auth., 827 F.3d 412, 422-23 (5th Cir. 2016) (the party filing the motion must demonstrate how additional discovery will create a genuine issue of material fact) (citations omitted).

The movant defendants assert that they need to depose ANPAC and David O'Donnell, as their testimony "may provide critical information related to ANPAC's actions and inactions during the two-year period during which it" engaged in conduct inconsistent with its later denial of coverage. They add that O'Donnell's testimony regarding his dual representation of ANPAC and its insureds also "may further bolster the Defendant's position as it relates to coverage and ANPAC's negligent failure to investigate its own defenses at the expense of all involved." These "explanations" are far too vague to support relief under Rule 56(d). Defendants do not explain how O'Donnell's testimony might "bolster" their position on coverage or the adequacy of ANPAC's investigation. And even if discovery might possibly

reveal additional conduct by ANPAC that was inconsistent with its later denial of coverage – and frankly, it is difficult to imagine they would discover conduct any more inconsistent than that which they have already identified – defendants do not suggest how that would improve their position on or affect the outcome of the present motions.

Defendants additionally contend they need to depose Chris Jones of AAU regarding whether ANPAC provided him with any underwriting guidelines and if so, whether those guidelines were followed, "as such information goes to the reasonableness of ANPAC's conduct." Jones, who performed the underwriting on the subject policy for ANPAC, has been previously deposed and questioned about the underwriting on the policy. Defendants do not explain how any further information they might discover could bear on the court's analysis of ANPAC's summary judgment motions.

Lastly, defendants assert that O'Donnell's testimony, and that of John Booth Farese, may "provide critical testimony corroborating the fact that ANPAC agreed to a settlement" with the Pooles. However, as the court has concluded that ANPAC has not demonstrated entitlement to summary judgment as to the Poole

defendants' claim for enforcement of the alleged settlement agreement,[11] such corroboration is not needed at this time.

For these reasons, the court will deny defendants' Rule 56(d) motion.

### IV. ANALYSIS

#### A. Coverage

Although all the defendants generally deny that Dr. Farese did not satisfy the pilot requirements for flying the plane, none has offered any valid argument or evidence to support that position. And in the court's opinion, based on the undisputed evidence adduced by ANPAC, it cannot reasonably be refuted that the policy, by its clear terms, provides no coverage for the losses resulting from the subject accident.

On March 15, 2016, the day he purchased the plane, Dr. Farese sought coverage through a broker, EBCO Aviation (EBCO). EBCO submitted a quote request to ANPAC, through AAU. After reviewing the quote request, which included pilot information on Jason Farese and John Booth Farese, AAU declined EBCO's request for $5 million in liability coverage, citing Jason Farese's lack of pilot experience. Chris Jones, who did the underwriting on the quote request, informed EBCO that "with a 650 total time pilot $1,000,000 CSL is all I am willing to consider at this

---

[11] See infra pp. 46-48.

time.  Maybe after the pilot adds some time we could look at higher limits.  Please confirm that you still want to bind at the $1,000,000 CSL limit."[12]  EBCO responded, "Yes, please bind with $1M."  Accordingly, AAU issued a binder, effective March 15, 2016 through March 15, 2017, which, for a premium of $10,485, provided $650,000 for physical damage coverage and a $1 million liability limit.  The binder included, as an "Additional Pilot Requirement", that "Jason Farese and John B. Farese would be required to receive at least 10 hours of flight instruction in the insured aircraft to include an IPC (instrument proficiency check) before acting as sole pilot in command."

On March 29, 2016, after coverage was initially bound, Dr. Farese submitted a completed aircraft insurance application, with accompanying pilot history forms, following which ANPAC issued its policy covering the subject aircraft.[13]  The ANPAC policy states:

---

[12] EBCO's quote request indicated that Jason Farese had 650 total pilot hours and John Farese, his father, had over 3,000 hours.  Neither had pilot hours in a Piper PA-31 Navajo.

[13] Defendants, or some of them, have argued that ANPAC did no underwriting prior to issuing the policy and that it instead engaged in post-claims underwriting, as evidenced both by the fact that a binder was issued before Dr. Farese even submitted an application for coverage and completed a pilot history form and by Chris Jones' deposition testimony that he would "not necessarily" have reviewed Jason Farese's pilot history form before issuing the policy.  However, as Jones explained, EBCO had already provided information about Dr. Farese's pilot experience when it submitted its quote request; and as evidenced

**REQUIREMENTS FOR THE PILOT FLYING THE AIRCRAFT:**[14]
The **aircraft** must be operated in **flight** only by a pilot
named below having the minimum qualifications shown.
The pilot must have a current and valid (1) medical
certificate, (2) flight review and (3) pilot certificate
with necessary ratings, each as required by the **FAA** for
each flight.  There is no coverage if the pilot does not
meet the qualifications or requirements specified below
for each designated use of the **aircraft**:

**MINIMUM REQUIREMENTS FOR PILOT, PILOT CERTIFICATE,
RATINGS AND LOGGED FLYING HOURS:**
Any person having a commercial or more advanced pilot
certificate with airplane multi-engine land and
instrument-airplane ratings issued by the **FAA** who has
logged at least 2,000 total hours as pilot with a minimum
of 1,000 hours in multi-engine aircraft of which not
less than 25 hours having been in the same make and model
aircraft being operated;

Otherwise;
Jason P. Farese
John B. Farese
Glen Inman

Additional Requirements:
Before acting as sole pilot in command, Jason P. Farese
and John B. Farese must each receive at least 10 hours
of flight instruction to include an instrument
proficiency check in the insured **aircraft** from an **FAA**
certified flight instructor who meets the any person
requirements stated above.

In addition, the liability section of the policy states:

We do not cover any … [b]odily injury or property
damage unless the requirements [for the pilot flying
the aircraft] are met.

---

by the ensuing communications between them, Jones obviously
considered Dr. Farese's pilot experience, or lack thereof, in
evaluating the quote request.  Moreover, EBCO made clear in its
communications with Jones that coverage was needed immediately,
as Dr. Farese had already purchased the plane.
    [14] The terms in bold appear as such in the policy.

At the time of the accident, Dr. Farese did not satisfy the "Requirements for the Pilot Flying the Aircraft" set forth in the policy.  When the binder was issued in March, and when the policy was issued in April, he did have a current and valid medical certificate[15] and a current and valid flight review (although his flight review had to be renewed by the end of May 2016 to remain current)[16]; and he had a pilot certificate with the necessary ratings.[17]  Thus, the policy, when issued, provided coverage for Dr. Farese to pilot the plane, but not to do so as sole pilot in command.  For that, he was required to meet not only these minimum requirements, but also to have ten hours' instruction in the insured aircraft from an FAA-certified flight instructor, to include an IPC.  At the time of the accident, Dr. Farese was acting as sole pilot in command, yet he did not have a current and valid flight review and he did not have the required ten hours of flight instruction, with IPC, *by a certified flight instructor*.  Arguably, by that date, he had

---

[15] Under 14 C.F.R. § 61.23(d), his medical certificate, issued August 15, 2014, was good for 60 months.
[16] FAA regulations require a flight review at least every 24 months.  14 C.F.R. § 61.56.
[17] The insured aircraft was a multi-engine plane, and Dr. Farese held a private pilot certificate with ratings for airplane single-engine land, multi engine land, and instrument airplane.

received ten hours of instruction in the insured aircraft[18]; but that instruction was by Charles Phillips, whose flight instructor certificate had expired six years earlier and had not been renewed or reinstated.[19]  Phillips was not authorized under FAA regulations to provide flight instruction.[20]  Not only was Phillips not an FAA-certified flight instructor when he purported to provide training to Dr. Farese, but even when he had a valid instructor certificate, he was only rated for single engine instruction; he did not have a multi-engine rating, which was required in order for him to administer training in multi-

---

[18] In an interview with the NTSB, Phillips reportedly told the NTSB investigator that he and Dr. Farese were only together alone in the plane one time, a night when they did take offs and landings.  That evidently was on March 17, 2016, the date on which Dr. Farese logged 2.9 hours of "dual instruction" in his pilot logbook.  Phillips told the investigator that other than that one occasion, all he did was ride with Dr. Farese on cross-countries with people.  He reportedly told the investigator, "You can't really do any training, especially single engine training with people in the airplane."  However, Phillips signed Dr. Farese's pilot logbook, "Charles Phillips CFI", on five additional dates:  March 31, April 19, April 24, May 14 and May 19, indicating that training occurred on those dates.  Further, although he did not sign the logbook on May 5, 2016, he was present with Dr. Farese on that date, on which Dr. Farese recorded "night currency, flight review, IPC."

[19] Under FAA regulations, a flight instructor certificate is valid for 24 calendar months from the month it was issued, renewed or reinstated.  14 C.F.R. § 61.19(d).  Phillips' flight instructor certificate expired in 2010 and was never renewed or reinstated.

[20] See 14 C.F.R. § 61.19(a)(1) ("The holder of a certificate with an expiration date may not, after that date, exercise the privileges of that certificate.").

engine aircraft, like the Piper PA-31 Navajo.[21] And, although Dr. Farese recorded in his logbook that Phillips had conducted an IPC and biennial flight review, neither would have been valid as Phillips was not authorized under applicable FAA regulations to administer a flight review or an IPC.[22]

Without the required hours of instruction in the insured aircraft from a certified flight instructor, the policy provided no coverage for any flight in which Dr. Farese acted as sole pilot in command. The policy so states, repeatedly and unambiguously: "There is no coverage if the pilot does not meet the qualifications or requirements specified … for each designated use of the aircraft"; "[T]here is no coverage under the policy for any accident or occurrence involving operation of the aircraft in flight if the pilot does not meet these [pilot] requirements"; "We do not cover any … [b]odily injury or

---

[21] See 14 C.F.R. § 61.195(b)(1) ("[A] flight instructor may not conduct flight training in any aircraft unless the flight instructor … [h]olds a flight instructor certificate with the applicable category and class rating").
[22] See 14 C.F.R. § 61.56 (c) (flight review must be given by an "authorized instructor" who endorses the logbook certifying that the person has satisfactorily completed the review); §61.1(ii) (defining "authorized instructor" as "person who holds a flight instructor certificate" issued pursuant to FAA regulations); § 61.193(a)(7) ("A person who holds a flight instructor certificate is authorized within the limitations of that person's flight instructor certificate and ratings to train and issue endorsements that are required for: …[a] flight review, operating privilege, or recency of experience requirement of this part.").

property damage unless the requirements of the Coverage
Identification Page regarding Pilots (Item 9) … are met."

Presumably, Dr. Farese believed he had satisfied the
policy's requirements for coverage.  There is no suggestion that
he was aware or suspected or had any reason to suspect that
Phillips was not a certified flight instructor; apparently, and
unfortunately, Phillips held himself out as such to Dr. Farese
and others.  That Dr. Farese believed he met the requirements,
however, does not make it so.  In the court's opinion, it was
incumbent on Dr. Farese to ensure that he satisfied the pilot
requirements for coverage for each flight.  The policy plainly
states:

> **You** must make certain that the pilot operating the
> aircraft in flight meets the requirements shown in
> Item 9 of the Coverage Identification Page.  There is
> no coverage under the policy for any accident or
> occurrence involving operation of the aircraft in
> flight if the pilot does not meet these [pilot]
> requirements.[23]

The policy defines "you" or "your" to mean the named insured;
the "named insured" was identified as OUAC, and its individual
executive officers and members," including Dr. Farese.  Thus,
notwithstanding what the court assumes was Dr. Farese's good

---

[23] The court acknowledges defendants' position and proof that
pilots rarely bother to check their flight instructors'
credentials, even though the FAA makes the information readily
available.  See https://amsrvs.registry.faa.gov/airmaninquiry.
In the court's opinion, however, that does not absolve them of
the consequences of failing to do so.

faith belief that the policy provided him coverage at the time of the flight at issue, in fact, it did not.

### B. Defenses and Counterclaims

### 1. Waiver/Estoppel:

Although there is no coverage for the losses from the accident under the clear terms of the policy, defendants assert that ANPAC waived its right to deny coverage or is estopped from denying coverage because of its actions after the plane crash, and more particularly, because it: failed to timely conduct a reasonable investigation of coverage; paid the claim under the hull coverage, to which the "Pilot Requirements for Flying the Plane" were equally applicable; defended the insureds in the Perrys' wrongful death lawsuit for months without a reservation of rights; filed the interpleader action in which it admitted coverage for the accident; and encouraged its insureds and claimants to engage in global settlement negotiations that would include the policy's $1 million liability limit.

Waiver and estoppel are distinct doctrines. Waiver is the intentional relinquishment of a known right; "[t]o establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived." Taranto Amusement Co., Inc. v. Mitchell Assocs., Inc., 820 So. 2d 726, 729–30 (Miss. 2002). Waiver thus "describes the act, or

the consequences of the act, of one party only[.]" <u>Pitts By & Through Pitts v. Am. Sec. Life Ins. Co.</u>, 931 F.2d 351, 357 (5th Cir. 1991). Estoppel, on the other hand, "exists when the conduct of one party has induced the other party to take a position that would result in harm if the first party's act were repudiated." <u>Id</u>. "In contrast to waiver, then, estoppel involves some element of reliance or prejudice on the part of the insured before an insurer is foreclosed from raising a ground for denial of liability that was known at an earlier date." <u>Id.</u> (citation omitted).[24]

In support of its motion on the counterclaims and response to defendants' motion for summary judgment on their claim of waiver, ANPAC insists that it could not have intentionally waived its right to deny coverage based on Dr. Farese's lack of required training because before the NTSB issued its Factual and Final reports in April/May 2018, *it did not know* (and had no reason to know) that there was any question about whether Dr.

---

[24] "Estoppel regarding performance of a contract may arise from a promise related to an existing fact (equitable estoppel) or a promise of future performance (promissory estoppel)." <u>Gulf Coast Hospice LLC v. LHC Grp. Inc.</u>, 273 So. 3d 721, 741 (Miss. 2019). The Poole defendants have asserted counterclaims for equitable estoppel and promissory estoppel. Neither can be used to extend coverage that is not otherwise afforded under the terms of the policy. <u>See Progressive Gulf Ins. Co. v. Kennedy</u>, No. 2:13-CV-52-KS-MTP, 2014 WL 2515213, at *4 (S.D. Miss. June 4, 2014) (equitable estoppel); <u>GuideOne Mut. Ins. Co. v. Rock</u>, No. CIVA 1:06CV218SAJAD, 2009 WL 1854452, at *7 (N.D. Miss. June 29, 2009) (promissory estoppel).

Farese had satisfied the policy's training and other requirements for flying the plane. It further asserts that its investigation following the discovery of this information was reasonable and timely, and that it acted appropriately thereafter by promptly issuing reservation of rights letters to its insureds, retaining new counsel, moving for dismissal of the interpleader action and filing this declaratory judgment action.

In the court's opinion, a jury could fairly find that ANPAC's actions were not timely or reasonable and that had it conducted an adequate investigation at the outset, it would have determined there was no coverage.[25]  However, as ANPAC further

---

[25] An insurer may be found to have waived a defense to coverage even in the absence of actual knowledge of the basis for denial.  See U.S. Fid. & Guar. Co. v. Yost, 183 Miss. 65, 183 So. 260, 263 (1938), error overruled, 183 Miss. 65, 185 So. 564 (1939) (fact that insurer did not know of defense until trial did not preclude finding of waiver; "if an insurer ought to have known the facts, or with proper attention to its own business, it would have been apprised of them, [it] cannot set up ignorance as an excuse").  There is evidence here to support a finding that ANPAC, "with proper attention to its own business," would have timely discovered its defense to coverage. The NTSB identified the training issue from the pilot and aircraft logbooks, which led its investigator to interview Dr. Farese's flight instructor.  ANPAC claims that its adjuster attempted to obtain the logbooks from the NTSB but was misinformed by the NTSB investigator that the logbooks had been destroyed or were illegible.  The court does not purport to judge the adjuster's credibility but would observe that there is cause to question her version of events.  But even assuming what she says is true, the adjuster still had photographic evidence from which it was obvious the pilot logbook was not destroyed or illegible.  Yet she did not pursue the matter, even though it was her job to verify that Dr. Farese had met the policy

contends, regardless of any actions it may or may not have taken that might in other circumstances be construed to support a finding of waiver (or estoppel), as a matter of law, ANPAC cannot have waived its right to deny coverage or be estopped to do so because under Mississippi law,[26] with one limited exception, addressed _infra_ pp. 34-40, waiver or estoppel cannot operate to create coverage where, as here, coverage does not otherwise exist under the terms of the policy.

"[C]ourts have long been reluctant to utilize waiver and estoppel doctrines in cases involving claims on insurance policies, lest it create a coverage neither the insurer nor the insured ever agreed would apply. Contracts should not be court evolved from action or non-action that is not expressive of a desire to be contractually bound." _Prudential Ins. Co. of Am. v. Clark_, 456 F.2d 932, 936 (5th Cir. 1972). "Specifically, the concern is that insurance companies will be subjected to loss for risks not contemplated by either party and for which no premium has been paid." _Id._ at 936 n.2 (citing Annot., 1 A.L.R.3d 1144 (1965)). Thus, "[i]t is a long-settled rule of

---

requirements for piloting the plane, and she knew that the logbooks, if they existed, could provide valuable evidence as to whether he had done so.

[26] The court's jurisdiction in this case is based on diversity of citizenship, the law of the forum state, Mississippi. _Meador v. Apple, Inc._, 911 F.3d 260, 264 (5th Cir. 2018).

law in Mississippi that the doctrines of waiver and estoppel may not operate to create coverage or expand existing coverage to risks expressly excluded." Pongetti v. First Cont'l Life & Acc. Co., 688 F. Supp. 245, 248-49 (N.D. Miss. 1988) (citing Miss. Hosp. & Med. Serv. v. Lumpkin, 229 So. 2d 573, 576 (Miss. 1969) ("[T]he doctrine of waiver or estoppel cannot be used to create a primary liability or to increase the coverage of insurance contracts.")); Frank Gardner Hardware & Supply Co. v. St. Paul Fire & Marine Ins. Co., 245 Miss. 320, 148 So. 2d 190, 193 (1963) ("the doctrines of waiver and estoppel may not be used to reform an insurance contract 'to create a liability for a condition … excluded by the specific terms of the policy.'"). A counterpart to this rule is that "a forfeiture provision may be waived." Id. (citing Morris v. American Fid. Fire Ins. Co., 253 Miss. 297, 173 So. 2d 618 (1965)). Indeed, cases espousing or acknowledging this rule typically differentiate forfeiture provisions, which an insurer can waive or be estopped to assert, from coverage-creating provisions. In Employers Fire Insurance Co. v. Speed, 242 Miss. 341, 133 So. 2d 627 (1961), the seminal case on this point, the Mississippi Supreme Court made this point, stating:

> This Court follows the general rule that waiver or
> estoppel can have a field of operation only when the
> subject matter is within the terms of the policy, and
> they cannot operate radically to change the terms of
> the policy so as to cover additional subject matter.

> Waiver or estoppel cannot operate so as to bring
> within the coverage of the policy property, or a loss,
> or a risk, which by the terms of the policy is
> expressly excepted or otherwise excluded. An insurer
> may be estopped by its conduct or knowledge from
> insisting on a forfeiture of a policy, but the
> coverage or restrictions on the coverage cannot be
> extended by the doctrines of waiver or estoppel.

Id. at 629. See also Marascalo v. Allstate Vehicle & Prop. Ins. Co., No. 4:18-CV-141-DMB-RP, 2020 WL 42893, at *4 (N.D. Miss. Jan. 3, 2020) (explaining that "the applicability of estoppel to [the insured's] claim depends on whether the residency requirement is properly defined as a definition of coverage or as a condition of forfeiture of coverage."); Sollek v. Westport Ins. Corp., No. 3:12CV115-DPJ-FKB, 2012 WL 5835535, at *4 (S.D. Miss. Nov. 2, 2012) (identifying as determinative issue "whether [insured] [was] attempting to apply waiver or estoppel to avoid forfeiture or conversely to extend coverage in a way that changes fundamentally the nature of the risk"); St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co., 500 F. Supp. 1365, 1381 (N.D. Miss. 1980), aff'd, 666 F.2d 932 (5th Cir. 1982) (stating that conditions going to coverage or scope of a policy of insurance, as distinguished from those furnishing a ground for forfeiture, may not be waived by implication from conduct or action).

One commentator has described the distinction between a forfeiture provision and a coverage provision as "the difference

between risk that has been 'accepted' subject to provisions of forfeiture, and risk that has been 'excepted' or excluded entirely from the policy.'" Sollek, 2012 WL 5835535, at *7 (quoting Jeffery Jackson, Mississippi Insurance Law and Practice § 7.5). In the present case, the policy requirements on which ANPAC – that Dr. Farese have a current and valid flight review and receive ten hours' training in the insured plane from an FAA-certified flight instructor, to include an IPC – were not merely forfeiture provisions but conditions precedent *to coverage* for any flight as to which he was the sole pilot in command. As Dr. Farese did not fulfill these conditions, coverage never arose for him to pilot the plane as sole pilot in command. See Austin v. Carpenter, 3 So. 3d 147, 149–50 (Miss. Ct. App. 2009) (quoting Turnbough v. Steere Broad. Corp., 681 So. 2d 1325, 1327 (Miss. 1996)) (a condition precedent is a "'condition which must be performed before the agreement of the parties shall become a binding contract or … a condition which must be fulfilled before the duty to perform an existing contract arises.'").[27]  ANPAC never "accepted" the risk of Dr.

---

[27] The latter iteration of this definition describes the policy's additional training requirement for Dr. Farese. Although a binding contract was formed between the parties under which some coverage was provided, there was no coverage for Dr. Farese to fly the plane as sole pilot in command until he satisfied the additional training requirements.  He never did so and that coverage never arose.

Farese's piloting the plane as sole pilot in command without having first undergone the required training.  See W. Food Prod. Co. Inc. v. U.S. Fire Ins. Co., 699 P.2d 579, 584 (Kan. Ct. App. 1985) (holding that requirement in aviation policy regarding medical requirement was not a forfeiture provision and could not be waived); cf. Sollek, 2012 WL 5835535, at *8 (holding that reporting requirement was not forfeiture provision but rather condition precedent to coverage and thus neither waiver nor estoppel could create coverage).

The court acknowledges but rejects defendants' argument that they are not impermissibly advocating the use of waiver or estoppel to alter the terms of the policy so as to cover additional subject matter or risk inasmuch as the plane that crashed is, in fact, the very same property that ANPAC's policy covered.  But the rule expressed by the Mississippi Supreme Court in Speed is that waiver or estoppel "cannot operate so as to bring within the coverage of the policy property, or a loss, or a risk, which by the terms of the policy is expressly excepted or otherwise excluded."  Speed, 133 So. 2d at 629 (emphasis added).  The risk from Dr. Farese flying the subject plane as sole pilot in command without having first received the required training is not a risk that ANPAC agreed to cover.

As one court has observed, an insurer cannot reasonably be expected to afford coverage "'without regard to the identity and

qualifications of those persons entrusted with flying the aircraft.'" Trishan Air, Inc. v. Fed. Ins. Co., 635 F.3d 422, 428 (9th Cir. 2011) (quoting Nat'l Ins. Underwriters v. Carter, 17 Cal. 3d 380, 131 Cal. Rptr. 42, 551 P.2d 362 (1976)).

> In view of the relatively few persons qualified to fly a plane, and the obvious hazard to the occupants and to the aircraft from flights by unqualified pilots, it is understandable that an insurer would insist on knowing who the proposed pilots were, evaluating their qualifications, and making its policy inapplicable to accidents involving pilots not disclosed to, nor approved by, the insurer.

Id. (quoting Carter). See also Old Republic Ins. Co. v. Gormley, 77 F. Supp. 2d 705, 707 (D. Md. 1999) (finding no coverage for helicopter accident when pilots did not have required flight experience because "[f]ederal courts uniformly enforce [pilot training and certification requirements]" and because "[p]ilot qualifications and experience are obviously factors bearing directly on the risk the insurer is underwriting").

The Fifth Circuit has similarly recognized that an aviation insurer's risk assessment necessarily takes into account a pilot's training and experience. Ideal Mutual Insurance Co. v. Last Days Evangelical Association, Inc., 783 F.2d 1234 (5th Cir. 1986), involved a policy that included a requirement that a certain named individual would operate the aircraft in flight only if he had a commercial pilot certificate with multi engine

land and instrument rating and a minimum of 1045 total logged flying hours. The pilot at issue had more than 1045 total flying hours but not the required minimum 1045 "logged" flying hours. Explaining that the policy "unambiguously required" the minimum 1045 "logged" hours "as a condition precedent to coverage," the court wrote:

> To give effect to this language, one need not look farther than the insurance company's business need to assess a risk prior to insuring it and setting the premium. An obvious element of that risk is the experience of those who will pilot the plane, and we can safely assume that both the risk and the premium will be higher if the pilot is Wrong Way Corrigan instead of Chuck Yeager. Thus, it does not require any speculation to conclude that Ideal included Burmeister's experience as a warranty that the risk it insured initially would be the same risk it paid out on.

Id. at 1238-39.

Likewise, in the case at bar, it was ANPAC's risk assessment that prompted its inclusion of the requirement that Dr. Farese receive additional training before he would be covered to pilot the plane as sole pilot in command. ANPAC did not approve Dr. Farese to pilot the plane until he complied with the policy's training requirements, which he did not do. To allow waiver or estoppel of the training requirement would

unquestionably extend coverage to a risk that ANPAC did not
agree to insure for the premium charged.[28]

### 2. Duty to Defend/Reservation of Rights

There are circumstances, relating to an insurer's duty to
defend, where estoppel can be used to extend coverage that is
not otherwise available under the language of a policy.  An
insurer "has two distinct obligations to its insured - (1) a
duty to indemnify its insured for covered claims and (2) a duty
to furnish a legal defense to certain claims."  Maryland Cas.
Co. v. Nestle, No. 1:09CV644-LG-RHW, 2010 WL 3735756, at *3
(S.D. Miss. Sept. 17, 2010) (citing Mimmitt v. Allstate County
Mut. Ins. Co., 928 So. 2d 203, 207 (Miss. Ct. App. 2006)).  An
insurer's duty to defend its insured "is triggered when it

---

[28] All of the defendants rely on United States Fidelity &
Guaranty Co. v. Yost, 183 Miss. 65, 183 So. 260 (1938), error
overruled, 183 Miss. 65, 185 So. 564 (1939), in support of their
position on waiver.  In Yost, the insurer was sued for a
wrongful death resulting from an elevator accident.  The
insurer's policy stated that it did not cover loss from
liability caused by an elevator "while in charge of any person
under the age fixed by law for elevator attendants, or if there
is no legal age limit, under the age of Sixteen (16) Years."
The elevator attendant at the time of the accident was 17 years
old but misrepresented his age to the adjuster as 19.  The
insurer first learned of his true age during his testimony at
trial.  The court characterized the age requirement as a
forfeiture condition, not a coverage condition.  Id. at 263.
Moreover, the court notes that, unlike the pilot requirements
for flying the plane at issue in this case, the age condition in
Yost was not obviously related to the risk of liability for
injury to others; in fact, under the policy, a 16-year-old would
have been covered to operate an elevator in the absence of a
state law establishing a minimum age.

becomes aware that a complaint has been filed which contains reasonable, plausible allegations of conduct covered by the policy.  However, no duty to defend arises when the claims fall outside the policy's coverage." Baker Donelson Bearman & Caldwell, P.C. v. Muirhead, 920 So. 2d 440, 451 (Miss. 2006). Where an insurer has questions about whether its policy provides coverage, it "has a right to offer the insured a defense, while at the same time reserving the right to deny coverage in [the] event a judgment is rendered against the insured." Moeller v. Am. Guar. & Liab. Ins. Co., 707 So. 2d 1062, 1069 (Miss. 1996). It does this by providing notice to the insured of its reservation of rights.

In Twin City Fire Insurance Co. v. City of Madison, the Fifth Circuit recognized that in the context of the duty to defend, estoppel can, in fact, expand coverage in the face of an otherwise policy exclusion:

> When the alleged misconduct of the insurer concerns the duty to defend, the insurer may be liable despite an exclusion otherwise applicable.  Upon withdrawal from the defense of an action, for example, an insurer may be estopped from denying liability under a policy, if its conduct results in prejudice to the insured. Southern Farm Bureau Cas. Ins. Co. v. Logan, 238 Miss. 580, 119 So. 2d 268, 272 (1960).  Even if the insurer would not have been liable had it not assumed the defense in the first instance, it may become liable for withdrawing, because the assumption of the defense may give rise to a duty to continue with the defense. Id., 119 So. 2d at 272.  Additionally, a breach of the duty to defend renders the insurer liable to the insured for all damages, including in a proper case

the amount of the judgment rendered against the
insured.

309 F.3d 901, 906 (5th Cir. 2002). <u>See also</u> Jeffery Jackson &

Jason Childress, Mississippi Insurance Law & Practice, § 11.16

(2019) ("[A]n insurer tendering a defense without obligation to

do so may be barred by estoppel from withdrawing the defense and

may become liable for the claim if the insurer's actions in

tendering and withdrawing (or attempting to withdraw) the

defense are prejudicial to the insured") (citing <u>Logan</u>, 119 So.

2d at 272).

    In the present case, ANPAC, six months after initially

providing its insureds a defense in the Perrys' wrongful death

action without a reservation of rights, changed its position and

began defending with a reservation of rights, but it never

withdrew from their defense.  Some defendants herein have argued

that by undertaking the insureds' defense in the Perrys'

wrongful death action without a reservation of rights, ANPAC

waived any defense to coverage and/or is estopped to deny

coverage.  However, in light of the rule in Mississippi that

waiver or estoppel cannot operate to expand coverage, the Fifth

Circuit held in <u>Bituminous Casualty Corp. v. Buckley</u>, 348 F.

App'x 23 (5th Cir. 2009), that an insurer could not be found to

have waived its defenses to coverage or be estopped to deny

coverage by defending without a reservation of rights.  <u>Id.</u> at

26 (insured's argument that insurer was estopped to deny coverage because it had no evidence that it sent a reservation of rights letter was foreclosed by rule that waiver or estoppel cannot operate to extend policy to cover additional subject matter); see also City of Southaven, MS v. Nutmeg Ins. Co., No. 2:92CV132-B-O, 1995 WL 1945521, at *5 (N.D. Miss. May 26, 1995), aff'd sub nom. City of Southaven, Miss. v. Nutmeg Ins. Co., 82 F.3d 414 (5th Cir. 1996) (insured did not waive right to deny coverage by defending without issuing a reservation of rights where policy clearly excluded coverage based on allegations of complaint).[29]

In Twin City, the Fifth Circuit identified another circumstance in which estoppel might apply, notwithstanding that it would result in an expansion of coverage. When an insurer defends without a reservation of rights, it has the right to control the defense of the claims against the insureds, since

---

[29] In Pitts By & Through Pitts v. American Security Life Insurance Co., 931 F.2d 351 (5th Cir. 1991), the Fifth Circuit, citing Ideal Mutual Ins. Co. v. Myers, 789 F.2d 1196 (5th Cir. 1986), stated, "[A]n insurer automatically waives the terms of a policy if it defends an insured without a reservation of its rights." Id. at 356. Myers was decided under Texas law, not Mississippi law; and the Texas Supreme Court has since rejected this notion of an automatic waiver. See Ulico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 785 (Tex. 2008) (insurer which takes control of its insured's defense without valid reservation of rights "can and should be prevented from denying benefits that would have been payable had the claim been covered because the insured is actually prejudiced by the insurer's actions").

ultimately, it is the insurer that will be liable for any judgment against the insured.  Moeller, 707 So. 2d at 1069. When an insurer defends under a reservation of rights, however, there is built-in conflict of interest, and thus, the insured must be given the opportunity to select his own counsel to defend the claim, and the insurer must also pay the legal fees reasonably incurred in the defense.  Id.  See also Twin City, 309 F.3d at 907 (quoting Moeller, 707 So. 2d at 1070) (insurer defending under reservation of rights should immediately notify insured "'of a possible conflict of interest between his interests and the interests of his insurance company so as to enable him to give informed consideration to the retention of other counsel'" to look after his interest).  If the insurer fails to give its insured an opportunity to select its own counsel to defend the claim and its conduct results in prejudice to the insured, "it may be estopped from denying liability … even if a policy exclusion would otherwise apply." Grain Dealers Mut. Ins. Co. v. Cooley, 734 F. App'x 223, 226 (5th Cir. 2018) (citing Twin City, 309 F.3d at 906).

The Poole and Perry defendants allude to this Twin City/Moeller exception in their summary judgment briefs, pointing out that O'Donnell represented both ANPAC and the insureds simultaneously for several months, both before and after ANPAC sent its reservation of rights letters, and citing

Twin City's holding that an insurer's conduct can cause an
expansion in coverage.  Even if O'Donnell did have a conflict of
interest for some period of time during his representation of
both insured and insurer,[30] this exception applies only if the
insurer's violation of its Moeller obligation results in
prejudice to its insured.  None of the insureds herein has
alleged or attempted to demonstrate any such prejudice.  That is
not to say they do not claim to have been prejudiced by ANPAC's
reversal of its position on coverage.  They do.  But the
prejudice they claim is not alleged to have resulted from any
violation by ANPAC of its Moeller obligations.

---

[30] When ANPAC hired O'Donnell to defend the insureds in the
Perry lawsuit, it had long closed its "investigation" and
determined there was coverage for the crash.  It was not
disputing coverage or attempting to limit its exposure; on the
contrary, it admitted that it owed the full $1 million.  Thus,
based on what ANPAC and O'Donnell knew at the time – not what
they *should have known* from a more thorough investigation but
what they *actually* knew – there would have been no conflict of
interest in O'Donnell's representing both ANPAC and the
insureds.  See Moeller, 707 So. 2d at 1070 ("Routinely, and in
the vast majority of cases, defense counsel is presented with no
conflict of interest between the two [because] [t]he claim is
covered by the policy, and the insurance carrier will pay in
full any judgment rendered against the insured….").  Once Chris
Jones read the NTSB reports, he recognized, and he told
O'Donnell, there was a "potential problem" with coverage.  From
that time to the time ANPAC sent its reservation of rights
letter, O'Donnell may have had a conflict, but there is no proof
that he actually took any action in favor of ANPAC to the
detriment of any insured.

Likewise, the Poole and Perry defendants have not identified or offered evidence of any prejudice, either to them or to any insured, as a result of any alleged <u>Moeller</u> violation. In the absence of prejudice, there is no basis for a finding of coverage by estoppel relating to any potential <u>Moeller</u> violation.

### 3. Judicial Admission/Judicial Estoppel

Defendants argue that the allegations in ANPAC's interpleader complaint by which it admitted that its policy provides coverage for the subject accident constitute binding judicial admissions that it may not now disavow to avoid coverage. They similarly argue that by having admitted coverage in the interpleader action, ANPAC is judicially estopped from denying coverage. The court must reject their position.

Judicial admissions are "factual assertions in pleadings … conclusively binding on the party who made them. A judicial admission has the effect of withdrawing a *fact* from contention." <u>Blankenship v. Buenger</u>, 653 F. App'x 330, 335 (5th Cir. 2016) (internal quotation marks and citations omitted). "A judicial admission is conclusive, unless the court allows it to be withdrawn…." <u>Martinez v. Bally's Louisiana, Inc.,</u> 244 F.3d 474, 476–77 (5th Cir. 2001) (internal quotation marks and citations omitted). For purposes of the interpleader action, ANPAC's allegations in its interpleader complaint were clearly intended

as a judicial admission which removed the issue of coverage from contention.[31]  However, "judicial admissions are not conclusive and binding *in a separate case from the one in which the admissions were made*.  Additionally, withdrawn ... pleadings are no longer judicial admissions."  Blankenship, 653 F. App'x at 335–36.  As the chancellor allowed ANPAC to voluntarily dismiss its interpleader complaint, there is no longer any "judicial admission" by which ANPAC could be bound.

It follows that "judicial estoppel, and not judicial admission, is the relevant doctrine in this case."  Douglas v. Norwood, 132 F. Supp. 3d 834, 850 (N.D. Miss. 2015).  However, defendants cannot establish both of the elements required for

---

[31] In this action, ANPAC insists that it never admitted in the interpleader action that its policy provided coverage for the crash.  Based on any reasonable reading of the interpleader complaint, that is obviously not the case.  In the interpleader complaint, ANPAC stated, unambiguously, that "a controversy exists concerning competing claims to the subject policy's per occurrence liability limit of $1 million which applies to the collective claims and potential claims of the defendants"; it was a "disinterested stakeholder in the proceeds of the subject policy"; that it was and had at all times "been willing, ready and able to pay the person or persons legally entitled to recover to receive the subject liability coverage proceeds in exchange for an order dismissing it with prejudice"; that it was "prepared to and [would] deposit with the clerk of the court the entire amount of the liability coverage proceeds upon approval by this Court of said deposit"; and that it sought to be "finally dismissed from the action, with prejudice, [and] he [sic] discharged from any further liability … under the subject policy … and that the clerk of [the] Court … disburse the subject insurance proceeds deposited in the registry of the court."

judicial estoppel.[32] "Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." Hall v. GE Plastic Pac. PTE Ltd., 327 F.3d 391, 396 (5th Cir. 2003) (internal quotation marks and citation omitted). The doctrine is intended "to prevent litigants from 'playing fast and loose' with the courts...." Id. (internal quotation marks and citation omitted). Before a party can be estopped, it must be shown that "the position of the party to be estopped is clearly inconsistent with its previous one" and "that party must have convinced the court to accept that

---

[32] Unlike equitable estoppel and promissory estoppel, which are designed to ensure fairness in the relationship between the parties, judicial estoppel is intended to protect the judicial system, rather than the litigants. In re Coastal Plains, Inc., 179 F.3d 197, 205 (5th Cir. 1999). Thus, courts addressing the issue have held that judicial estoppel can operate to create coverage whereas equitable and/or promissory cannot. See, e.g., Liberty Mut. Fire Ins. Co. v. Woolman, 913 F.3d 977, 997 (10th Cir. 2019) (separately analyzing claims of judicial estoppel and of equitable and promissory estoppel, the latter of which cannot be used to expand coverage beyond an insurance contract's terms); Tucker v. Am. Int'l Grp., Inc., No. 3:09-CV-1499 CSH, 2015 WL 403195, at *31 (D. Conn. Jan. 28, 2015) (explaining that equitable estoppel and judicial estoppel serve different purposes, the former to ensure fairness in the parties' relationship and the latter to protect judicial integrity, and holding that equitable estoppel could not be used to create coverage but analyzing facts to determine whether elements of judicial estoppel were met); Tozzi v. Long Island R. Co., 170 Misc. 2d 606, 613, 651 N.Y.S.2d 270, 275 (Sup. Ct. 1996), aff'd, 247 A.D.2d 466, 668 N.Y.S.2d 102 (1998) (that the invocation of judicial estoppel, the intent of which is not to protect the individual litigant but to protect the integrity of the judicial system itself, may create insurance coverage).

previous position." Id. (internal quotation marks and citation omitted). ANPAC's position on coverage in this action, namely, that there is none, is clearly inconsistent with its admission of coverage in the interpleader action. However, the chancery court did not accept or act on ANPAC's coverage position in any way. On the contrary, it affirmatively determined not to act by allowing ANPAC to dismiss the action.

### 4. Innocent Insured

In its response to ANPAC's motions, Dr. Farese's estate argues that both OUAC and Jason Farese are entitled to coverage as "innocent insureds." Specifically, it argues (1) that OUAC was innocent of any wrongdoing and therefore under the "innocent insured" doctrine, cannot be denied coverage because of Dr. Farese's failure to satisfy the policy's pilot requirements and/or because of Charles Phillips' alleged fraud in representing himself to be a certified flight instructor; and (2) that Dr. Farese was a victim of fraud perpetrated by Phillips and was innocent of any wrongdoing such that his estate, too, is entitled to coverage as an "innocent insured."

The Mississippi Supreme Court held in McGory v. Allstate Insurance Co., 527 So. 2d 632 (Miss. 1988), that "an innocent co-insured is entitled to recover for losses intentionally caused by another co-insured unless the policy contains a non-severability provision which excludes coverage for such losses

43

to all insureds." <u>McFarland v. Utica Fire Ins. Co. of Oneida Cty., N.Y.</u>, No. 93-7936, 1994 WL 16464174, at *6 (5th Cir. Jan. 6, 1994) (describing <u>McGory</u> holding).  This principle has no applicability here.  This case does not involve any intentional loss or misconduct *by an insured.*  There is no allegation or proof of any intentional wrong by Dr. Farese; and although Phillips may have committed fraud, he was not an insured. Further, even if Dr. Farese was not an "innocent" insured, despite his good faith belief that he satisfied the requirements for coverage, then neither is OUAC.  OUAC had the same knowledge, or lack of knowledge, as Dr. Farese; and as a named insured, it was equally responsible for "mak[ing] certain that the pilot operating the aircraft in flight [met] the requirements under the terms of the policy" for operating the aircraft in flight.

### 5. Bad Faith — Poole Defendants

ANPAC argues that the Poole defendants lack standing to assert a claim for bad faith.[33]  "Because the insurer's obligation of good faith is owed only to insureds, only insureds—and their successors in interest and beneficiaries—may

---

[33] The Perry defendants have not asserted a counterclaim for bad faith, yet they have asserted arguments relating to bad faith.  Assuming the Perrys intended such a claim, the court's conclusions with respect to the Poole defendants' bad faith claim would apply equally to any such claim by the Poole defendants.

pursue bad-faith claims against an insurer."  Jackson, Miss.
Ins. Law and Practice § 13:16 (citing cases).  The Poole
defendants acknowledge the general rule in Mississippi that the
only claim an injured party may bring against an insurer is a
declaratory judgment action under Rule 57 of the Federal Rules
of Civil Procedure, but they contend that ANPAC's egregious
conduct justifies application of an exception to this rule.  And
they argue that while this is an issue of first impression, the
court would be warranted in predicting that the Mississippi
Supreme Court would allow a bad faith cause of action under
these circumstances based on its opinion in Poindexter v.
Southern United Fire Insurance Co., 838 So. 2d 964 (Miss. 2003).
The court is unpersuaded.  In Poindexter, the court suggested
that an insurer that secured dismissal of an injured party's
declaratory judgment action by admitting there was coverage
would be judicially estopped from later attempting to deny
coverage and by any such attempt would "perhaps open [itself] up
to bad-faith liability as well."  Id. at 968.  Even assuming the
Mississippi Supreme Court would, in fact, recognize a bad faith
claim in that circumstance, a different circumstance is
presented here.  Poindexter assumed a scenario in which the
insurer's later denial would be ineffective because of judicial
estoppel, such that the policy would provide coverage, if only
by estoppel.  Here, however, there is no coverage, either under

the terms of the policy or by application of any waiver or estoppel doctrine.

In a supplemental response to ANPAC's motion for summary judgment regarding counterclaims, the Poole and Perry defendants argue that as passengers in the insured aircraft, they were classified under the policy as "someone we protect" and thus were, in fact, "insureds" under the policy. Defendants present this language out of context. The policy does not make them "insureds". Rather what it does is extend liability coverage to passengers ("someone we protect") such that they are insured for claims asserted against them by others; they are not treated as "someone we protect" for claims asserted by them against policy insureds. Their argument that they are "insureds" is rejected.

### 6. Breach of Settlement Agreement – Poole Defendants

The Poole defendants have asserted a counterclaim against ANPAC seeking enforcement of an alleged settlement agreement by which O'Donnell, on behalf of ANPAC, agreed to payment of $500,000 from policy proceeds in exchange for the Poole defendants' release of any claims they might have against the J. Farese Estate. They contend that ANPAC has failed to honor that agreement. In support of their claims, they point to e-mails

which they say evidence O'Donnell's agreement, on behalf of ANPAC, to the settlement terms.[34]

ANPAC seeks summary judgment on this claim, arguing that it never agreed to any settlement with the Poole defendants, or any of the claimants.[35]  It contends that even if the e-mails could be interpreted as O'Donnell's agreeing to accept the Poole defendants' settlement offer, he lacked authority to do so on behalf of ANPAC.  Even if the court were of the view that ANPAC had adequately shown that O'Donnell lacked actual authority – and it is not - it would nevertheless find that ANPAC has not shown it is entitled to summary judgment on this claim.[36]  Under Mississippi law, there is a rebuttable presumption that an attorney has apparent authority to enter into a binding settlement.  Parmley v. 84 Lumber Co., 911 So. 2d 569, 573

---

[34] In addition to this alleged settlement agreement, the Poole defendants have purported to assert a claim of quasi-estoppel relating to a settlement agreement they reached among themselves as to the division of any proceeds they might receive under the ANPAC policy.  The Poole defendants' response to ANPAC's motion for summary judgment regarding counterclaims does not mention this agreement or claim based thereon.  The court will grant the motion as to this claim.

[35] ANPAC could contractually agree to waive defenses to coverage.  Ulico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 787 (Tex. 2008) ("Changing a policy's coverage to encompass risks otherwise not covered must be by contractual means.").

[36] The Farese Estate has alleged that a settlement agreement was reached in principle.  In its response to ANPAC's motion, it asserts that "[t]he agreed settlement did not proceed" because ANPAC, despite having admitted coverage and encouraged settlement, reversed its coverage position right at the time the agreement was reached.

(Miss. Ct. App. 2005) ("An attorney is presumed to have the authority to speak for and bind his client.") (citing <u>Fairchild v. General Motors Acceptance Corp.</u>, 254 Miss. 261, 265, 179 So. 2d 185, 187 (1965)); <u>Melton v. Smith's Pecans, Inc.</u>, 65 So. 3d 853, 858 (Miss. Ct. App. 2011) ("The underlying question of whether a settlement was reached, based on a meeting of the minds between the parties and apparent authority by their attorneys, is a question of fact.") (citing, among other cases, <u>Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Republic of Venez.</u>, 575 F.3d 491, 499 (5th Cir. 2009)). Therefore, ANPAC's motion for summary judgment on the Poole defendants' counterclaim for breach of this alleged settlement agreement will be denied.[37]

---

[37] The Poole defendants have asserted a counterclaim alleging that by virtue of their settlement agreement with the Estate of Jason Farese, to which ANPAC agreed, they are entitled to recover under the ANPAC policy as third-party beneficiaries. ANPAC has read this claim as charging that ANPAC is a third-party beneficiary of a separate settlement reached between the Poole claimants as to how any recovery under the policy would be divided among them. That is not the basis of this claim, however, and ANPAC's argument that it was not a party to and hence cannot be bound by a settlement agreement among the Poole claimants, is not a valid basis for summary judgment as to the claim they have actually alleged. As this issue has not been raised or briefed, the court does not consider at this time whether the Poole defendants would become third-party beneficiaries of the ANPAC policy (or how such status might benefit them) if they were to prove that ANPAC agreed to the payment of $500,000 under the policy in settlement of the Pooles' claims against the Farese Estate.

### 7. **NME – Breach of Duty to Defend**

NME was one of two members of OUAC and a named insured under the ANPAC policy.  Following the crash, OUAC filed articles of dissolution.  In their lawsuit for wrongful death, the Perry defendants also sued NME and OAC, but not as to their wrongful death claim.  Rather, they alleged that NME and/or OAC should be held personally liable to the extent they may have received distributions of assets in the winding-up of OUAC in violation of Mississippi Code Annotated § 79-29-813(1), which requires that assets be distributed, first, to satisfy the liabilities of OUAC, which would include those resulting from the plane crash.  NME has alleged a counterclaim against ANPAC for breach of the duty to defend, alleging that although ANPAC initially acknowledged its duty to defend, it subsequently advised NME that it would not defend NME because the allegations against NME did not relate to the plane crash but to the dissolution of OUAC, and thus were not covered under the policy.  While NME alleges it was owed a defense by ANPAC, the policy clearly does not cover the Perry defendants' allegations of corporate malfeasance against it.  Moreover, NME -- which has not responded to ANPAC's summary judgment motion -- has not alleged or offered any proof that it was prejudiced by ANPAC's

"withdrawal" from its defense.[38]  Accordingly, its counterclaim
will be dismissed.

### 8.  Bad Faith – Estate of Jason Farese

ANPAC has moved for summary judgment on the J. Farese
Estate's claim for bad faith, contending it cannot establish
each of the essential elements of this claim.  In its response
to ANPAC's motions, the J. Farese Estate argues that there is
coverage for the accident, either based on the terms of the
policy or by waiver or estoppel; and it argues that it has been
prejudiced by ANPAC's actions, including its failure to conduct
a timely and reasonable investigation and its unreasonable delay
in reserving its rights and filing this declaratory judgment
action.  But it does not assert that any of the actions was done
intentionally or maliciously, as required to support a cause of
action for bad faith.  See Hamilton v. Hopkins, 834 So. 2d 695,
703 (¶26) (Miss. 2003) ("To qualify for punitive damages in a
breach of contract case, a plaintiff must prove by a
preponderance that the breach was the result of an intentional
wrong or that a defendant acted maliciously or with reckless
disregard of the plaintiff's rights.").  In fact, unless the
court has overlooked it, the response does not even mention the
bad faith counterclaim.  Based on ANPAC's motion, the court will

---

[38]Although ANPAC indicated it would defend NME, ANPAC's
retained attorney never entered an appearance on behalf of NME.

grant summary judgment as to the J. Farese Estate's counterclaim for bad faith.

####    IV.    CONCLUSION

For the reasons set forth herein, the court concludes there is no coverage for the subject accident under the terms of ANPAC's policy.  If the ANPAC policy's pilot requirements for flying the plane were merely forfeiture provisions, and not conditions precedent to coverage, then ANPAC's alleged post-crash conduct – the shoddy investigation, payment of the hull claim, admission of coverage in the interpleader action, defense of its insureds without a reservation of rights, unreasonable delay in issuing a reservation of rights, and encouraging settlements that would include its policy limits -- would certainly support a finding of waiver or estoppel.  But as the court has concluded that these were not mere forfeiture provisions but coverage-creating provisions, and as ANPAC did not withdraw from the insureds' defense and defendants have not claimed or adduced evidence of prejudice flowing from any violation of ANPAC's Moeller obligations, then the court must conclude, as a matter of law, that coverage for the subject accident cannot be found on the basis of waiver or estoppel. The court further concludes that the claims of the J. Farese Estate and of NME for breach of contract and bad faith breach of contract fail as a matter of law and must be dismissed.

Accordingly, it is ordered that ANPAC's motion for summary judgment as to coverage is granted, as is its motion for summary judgment as to the counterclaims of the J. Farese Estate for breach of contract and bad faith breach of contract; of NME for breach of contract and bad faith breach of contract; and of the Poole defendants for equitable estoppel, promissory estoppel, quasi-estoppel and bad faith.

The court concludes that ANPAC has not shown that it is entitled to summary judgment as to the counterclaim of the Pooles for enforcement of an alleged $500,000 settlement to which ANPAC allegedly agreed, and therefore it is ordered that ANPAC's motion for summary judgment is denied as to that counterclaim and its third-party beneficiary counterclaim.

SO ORDERED this 30th   day of March, 2021.


                                    /s/Tom S. Lee
                                   UNITED STATES DISTRICT JUDGE